ARENT FOX LLP
Debra J. Albin-Riley, Bar No. 112602
Alexander R. Smart, Bar No. 253059
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:   213.629.7400
Facsimile:   213.629.7401

Paul M. Kaplan (Admission *pro hac vice* pending)
Jennifer L. Bougher (Admission *pro hac vice* pending)
Matthew Trokenheim (Admission *pro hac vice* pending)
1675 Broadway
New York, NY 10019
Telephone:   212.484.3900
Facsimile:   212.484.3990

Attorneys for Plaintiffs
MACQUARIE GROUP LIMITED, MACQUARIE
BANK LIMITED, DAVID CLARKE, ALLAN MOSS,
RICHARD SHEPPARD, BEN BRUCK AND JOHN
BRAKEY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MACQUARIE GROUP LIMITED, MACQUARIE BANK LIMITED, DAVID CLARKE, ALLAN MOSS, RICHARD SHEPPARD, BEN BRUCK AND JOHN BRAKEY,<br><br>Plaintiffs,<br><br>v.<br><br>PACIFIC CORPORATE GROUP LLC,<br><br>Defendant. | Case No.  08-CV-2113-IEG (WMC)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Macquarie Group Limited, Macquarie Bank Limited, David Clarke, Allan Moss, Richard Sheppard, Ben Bruck and John Brakey (collectively "Plaintiffs"), by their attorneys, Arent Fox LLP, as and for their First Amended Complaint allege as follows:

NATURE OF THE ACTION

1. This is an action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, for the purpose of determining a question of actual controversy between the parties as more

fully set out below.

2. This action also seeks damages to make Plaintiff Macquarie Bank Limited ("Macquarie") whole for the harm it suffered as a result of the tortious and illegal actions of Defendant Pacific Corporate Group ("Defendant" or "PCG").

3. The instant dispute arose when PCG threatened Plaintiff with a draft complaint containing various causes of action stemming from the alleged conduct of Macquarie's former, rogue employee Peter Martenson ("Martenson").  Martenson, without Macquarie's knowledge or consent, sent emails to PCG employees and to the press pretending to be a PCG executive.  Yet PCG wrongly claimed that Plaintiffs were not only responsible for Martenson's individual actions, but are purportedly liable to PCG for $25,000,000.00 in unspecified damages.  Several weeks after Plaintiffs commenced the instant action in the United States District Court for the Southern District of New York seeking declaratory relief, PCG commenced an action in California state court ("the California State Court action"), expanding its claims to include various additional meritless causes of action, most of which still apparently stem from the alleged conduct of Martenson as well as an alleged conspiracy to "steal [PCG's] confidential information and clients."

4. In reality, PCG is the perpetrator and Macquarie is the victim.  PCG, in an overt attempt to damage the business and reputation of Macquarie and its investors, conspired to lock Macquarie and its investors out of a lucrative fund, to which PCG then gained access.  As a result of PCG's coercion and interference, Macquarie's commitment into the fund was greatly reduced and its investors were harmed.  PCG's actions constitute violations of Section 1 of the Sherman Act, deceptive acts and practices in violation of the New York General Business Law § 349, and tortious interference with prospective economic relations.

5. PCG also obtained Macquarie's confidential documents without Macquarie's knowledge or consent, and has already used those documents to Macquarie's detriment.  PCG is therefore also liable to Macquarie for conversion.

6. On October 31, 2008, the District Court for the Southern District of New York, the Honorable P. Kevin Castel, presiding, issued an order transferring the action to the United States

District Court for the Southern District of California pursuant to 28 U.S.C. § 1404(a).  Certain of the plaintiffs here have contested jurisdiction in the California State Court action and by their appearance in this action now pending in this District, do not waive such objections to jurisdiction of the California state court.

## THE PARTIES

A. <u>Plaintiffs</u>

7. Plaintiff Macquarie Group Limited ("MGL") is a publicly traded Australian corporation which has its principal place of business in Sydney, Australia.

8. Plaintiff Macquarie Bank Limited ("MBL" or "Macquarie") is an Australian corporation which has its principal place of business in Sydney, Australia.  MBL is an indirectly wholly owned subsidiary of MGL.

9. Plaintiff David Clarke ("Clarke"), a resident of Sydney, Australia, was the Executive Chairman of MBL until March 2007, the Non-Executive Chairman of MBL since April 2007, and the Non-Executive Chairman of MGL since November 2007, at all times relevant to this action.

10. Plaintiff Allan Moss ("Moss"), a resident of Sydney, Australia, was the Managing Director and Chief Executive of MBL until November 2007 and the Managing Director and Chief Executive of MGL since November 2007, at all times relevant to this action, and is now retired from MGL as of May 24, 2008.

11. Plaintiff Richard Sheppard ("Sheppard"), a resident of Sydney, Australia, was the Deputy Managing Director of MBL until November 2007 and the Managing Director of MBL since November 2007, at all times relevant to this action.

12. Plaintiff Ben Bruck ("Bruck"), a resident of Sydney, Australia, was the Head of Macquarie Funds Management Group, a business division within MGL, at all times relevant to this action.

13. Plaintiff John Brakey ("Brakey"), a resident of Sydney, Australia, was the head of Macquarie Funds Management Group's Alternative Investments private equity management business at all times relevant to this action.

B.  Defendant

14. Upon information and belief, Defendant Pacific Corporate Group ("Defendant" or "PCG") is a Delaware limited liability corporation with its principal place of business in La Jolla, California. Upon information and belief, PCG also maintains an office in New York, New York for the conduct of business. Upon information and belief, PCG's sole member is Christopher Bower, a resident of California.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the claims alleged herein pursuant to 28 U.S.C. §1332(a) given the diversity of citizenship between the parties and that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 because it arises out of the laws of the United States, and specifically those concerning commerce and antitrust regulations: Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)). This Court has supplemental jurisdiction over the remaining claims for relief and declaratory judgment because they arise out of the same common nucleus of operative facts as those claims arising under the federal statutes.

17. This action is now pending in this District pursuant to an order issued by the District Court in the Southern District of New York issued pursuant to 28 U.S.C. § 1404(a). MGL, Clarke, Moss, Sheppard, Bruck and Brakey appear in this action to seek declaratory relief as to the claims brought against them in California state court. These plaintiffs have contested and continue to contest personal jurisdiction over them in the California State Court action and do not intend to waive such objection to jurisdiction by their declaratory relief claims asserted herein.

## FACTUAL BACKGROUND

A.  PCG Threatens Legal Action Against Certain Macquarie Entities And Employees

18. In or about January 2008, PCG notified the Plaintiffs that it had claims against certain of the Plaintiffs and others for violations of 18 U.S.C. §§ 1028(a)(7), 1030, and 1343, the Investment Advisers Act of 1940 (15 U.S.C. § 80b-1 *et seq.*), California Penal Code §§ 502, 529,

530.5 and 538(a), and California Business and Professions Code § 17200, stemming from the conduct of Martenson, a former employee of a subsidiary of MGL.  PCG presented Plaintiffs with a proposed complaint (the "Draft Complaint") that it intended to file against Plaintiffs in the Superior Court of the State of California for the County of San Diego.  A true and correct copy of the Draft Complaint is attached hereto as Exhibit A.

19. Plaintiffs commenced this action on April 7, 2008 seeking a declaration of its rights in order to resolve the pending controversy.

B. <u>Nearly Seven Weeks After Macquarie Sought Relief From This Court, PCG, For The First Time, Brought An Action Against Macquarie And Others In California State Court</u>

20. In or about May 23, 2008, PCG filed a Complaint (the "CA Complaint") against certain of the Plaintiffs and others in the Superior Court of the State of California for the County of San Diego.  A true and correct copy of the CA Complaint is attached hereto as Exhibit B.

21. In its CA Complaint, PCG asserted claims against Plaintiffs for violations of California Penal Code §§ 502, 529, 530.5, 538(a), and California Business and Professions Code § 17200, as well as claims for deceit, intentional interference with contracts, intentional and negligent interference with economic relationships, invasion of privacy, conspiracy to breach contracts, and negligence (collectively, the "Theories of Liability"), all stemming from the conduct of Martenson and an alleged conspiracy to "steal [PCG's] confidential information and clients."

C. <u>Plaintiffs Vehemently Deny The Claims Alleged By PCG In Its Complaint</u>

22. Upon information and belief, prior to being employed by a subsidiary of MGL, Martenson was employed by PCG.

23. Upon information and belief, during Martenson's employment by PCG, PCG attempted to require him to sign an unenforceable non-competition agreement.

24. PCG claims that in October 2006, subsequent to Martenson's joining a subsidiary of MGL, Martenson sent e-mail messages to a number of PCG employees in which he falsely identified the author of the e-mails as PCG Chairman Christopher Bower ("Bower").

25. PCG claims that in October 2006, Martenson also sent an email to Dow Jones

reporter Laura Kreutzer, in which he falsely identified the author of the e-mail as PCG's former President. PCG alleges that Martenson "purported to transmit disparaging information about PCG from the website of PCG's client Avadis."

26. PCG claims that Plaintiffs are responsible for Martenson's conduct. Plaintiffs vehemently deny PCG's contention.

27. Despite PCG's claims that Martenson was acting on behalf of the other Plaintiffs in sending these e-mails, Martenson acted independently in his sole and exclusive personal capacity in sending these e-mail messages.

28. Martenson sent the e-mail messages outside the scope of his employment and did not involve, discuss with, or otherwise engage any Plaintiff in his actions before he transmitted the e-mails.

29. None of the Plaintiffs had any prior knowledge that Martenson was sending these e-mails.

30. There was no conspiracy by Plaintiffs to transmit these e-mails or to damage PCG in any way.

31. PCG falsely claims that Plaintiffs were aware of Martenson's conduct before he transmitted the e-mails and engaged in a conspiracy to damage it.

32. Based on its false claims that Plaintiffs were aware of Martenson's conduct, that Martenson was acting within the scope of his employment, that there was a conspiracy amongst the Plaintiffs to damage PCG, and that Martenson acted on behalf of Plaintiffs in sending the e-mails, PCG wrongfully claimed in the Draft Complaint that Plaintiffs have committed violations of the following statutes: computer crime pursuant to California Penal Code § 502, false personation pursuant to California Penal Code § 529, unauthorized use of personal identifying information pursuant to California Penal Code § 530.5, false signing of a letter pursuant to California Penal Code § 538(a), and unfair trade practices pursuant to California Business and Professions Code § 17200.

33. Also based on its false claims that Plaintiffs were aware of Martenson's conduct, that Martenson was acting within the scope of his employment, that there was a conspiracy

1  amongst the Plaintiffs to damage PCG, and that Martenson acted on behalf of Plaintiffs in
2  sending the e-mails, PCG wrongfully claims in the CA Complaint that Plaintiffs have committed
3  intentional interference with contracts, intentional interference with economic relationships,
4  negligent interference with economic relationships, invasion of privacy, unfair competition and
5  negligence.

6  34.  PCG wrongly claims in the CA Complaint that in 2005, Macquarie "secretly
7  intended to take GESB [the Government Employees Superannuation Board] as its client."
8  Macquarie never had any such intention, secret or otherwise. To the contrary, GESB is and was
9  Macquarie's client long before 2005, and upon information and belief, PCG has never had any
10 contractual relationship with GESB.

11 35.  PCG falsely claims in the CA Complaint that "MBL was secretly planning to
12 compete with PCG with respect to private equity investments." Even if Macquarie had such a
13 "secret" plan – which it did not – any plan, secret or otherwise, to compete with PCG in the
14 market is not illegal or otherwise improper.

15 36.  PCG incorrectly claims in the CA Complaint that Macquarie asked PCG
16 employees Peter Martenson ("Martenson"), Eric Becker ("Becker") and Rick Fratus ("Fratus") to
17 disclose confidential PCG information to Macquarie. In reality, Macquarie never asked
18 Martenson, Becker or Fratus to disclose PCG's confidential information to Macquarie, and no
19 confidential PCG information was disclosed to Macquarie.

20 37.  PCG further falsely claims in the CA Complaint that Macquarie "secretly
21 approached PCG employees Martenson, Becker and Fratus and asked them to leave PCG and to
22 join MBL." Macquarie never asked Martenson, Becker or Fratus to leave PCG, and in any event,
23 the actions alleged by PCG do not constitute illegal or otherwise improper acts.

24 38.  Neither Becker nor Fratus resigned from PCG based upon any solicitation or
25 promise of employment by Macquarie. Rather, Becker and Fratus each resigned from PCG due
26 to their dissatisfaction with the business practices of Christopher Bower and PCG. Neither
27 Becker nor Fratus had offers of employment from any Macquarie-related entity at the time they
28 resigned from PCG. Becker and Fratus did not join Macquarie until July 1, 2005 – three months

1  from the dates of their resignations from PCG.  In fact, while Becker and Fratus considered
2  employment alternatives following their resignations from PCG, PCG made concerted efforts to
3  induce Becker and Fratus to rejoin PCG.  Despite the substantial amount of money offered by
4  PCG to Becker and Fratus, PCG's offers were repeatedly rejected by Becker and Fratus due to
5  their dissatisfaction with the business practices of Bower and PCG.

6  39.   There was no conspiracy by Plaintiffs to breach fiduciary duties or non-disclosure
7  agreements allegedly owed by any PCG employee to PCG, or to cause PCG any damage.

8  40.   PCG further alleges that Plaintiffs interfered with PCG's alleged contractual
9  relationships with AP-1, Avadis, California Public Employees' Retirement System ("CalPERS"),
10 Illinois Teachers' Retirement System, New York City Retirement System, Ohio Public
11 Employees' Retirement System, Oregon Public Employees Retirement Fund and Rhode Island
12 State Investment Commission, but PCG includes nothing in its allegations to inform Plaintiffs or
13 the court of how and when such alleged interference allegedly occurred.  Plaintiffs never
14 interfered with any of PCG's relationships with its clients.

15 41.   Based upon its false claims that Macquarie improperly intended to take GESB as
16 its client, secretly and improperly planned to compete with PCG in the market, improperly
17 obtained PCG's confidential information, and secretly persuaded PCG's employees to join
18 Macquarie, PCG wrongfully claims that Plaintiffs have committed deceit, intentional interference
19 with contracts, unfair competition, conspiracy to breach fiduciary duties, conspiracy to breach
20 contract and negligence.

21 42.   PCG asserts that it is entitled to relief from Plaintiffs under the Theories of
22 Liability.

23 43.   PCG has informed Plaintiffs that it is entitled to $25,000,000.00 in compensation
24 for the damages that it alleges in the CA Complaint.

25 **D.   Macquarie Terminated Its Business Relationship With PCG**

26 44.   PCG and Macquarie previously had a business relationship such that PCG
27 provided certain financial services to Macquarie.

28 45.   Macquarie ultimately terminated its business relationship with PCG.  PCG

suffered from chronic employee defections which was essentially a revolving door of employees, creating material concerns about PCG's ability to serve Macquarie's most basic client needs. Macquarie also had serious concerns that PCG and its principals engaged in improper business practices.

E. <u>PCG Orchestrated A Concerted Refusal To Deal Against Macquarie, Designed To Hobble Macquarie's Effort To Enter The Pension Fund Market</u>

46. Aisling Capital LLC ("Aisling") is, upon information and belief, a life science venture capital fund manager with whom Macquarie did business. Upon information and belief, Aisling maintains its office in New York, New York.

47. A pension fund is a pool of assets bought with contributions made under a pension plan. Pensions are funded by employers for the benefit of their employees. When an employee retires, it receives payments from the pension fund. These payments are pension plan benefits. There are many kinds of pension plans including defined benefit and defined contribution plans. Pension plans funded by governments are public pension funds.

48. Public pension funds have trillions of dollars in capital to invest on behalf of their beneficiaries. Pension funds, and in particular, public pension funds, can be highly risk averse. There are often complicated laws and regulations governing how public pension funds can invest. And the funds themselves often have extensive rules and regulations. As a consequence, to be an effective public pension fund investment manager, one must develop highly specialized knowledge and understanding. Developing such knowledge and understanding can take many years and require millions of dollars in investment.

49. Before public pension funds seek the services of a particular investment manager, the funds will engage in extensive due diligence. This due diligence will include an in-depth review of the manager's track record. Without this track record, public pension funds will not invest with a new manager. Reputation is therefore essential to secure investment business from public pension funds. Developing such reputation can also take many years and require millions of dollars in investment. As a consequence, entry barriers are very high.

50. Public pension funds are apprehensive about dealing with new investment

1  managers. Public pension funds will scrutinize very closely a new investment manager's first
2  investments. If the manager fails on those investments, the manager may very well not be able to
3  secure any future business and not be able to enter the market successfully. The first investment
4  forays a new investment manager make will have a disproportionately greater significance in its
5  ability to enter and compete. Success in those first investment forays is essential for a new
6  investment manager to compete. Conversely, failure in those first investment forays can be fatal
7  for a new investment manager.

8  51.  For example, a failure by a new manager to secure meaningful access to an
9  investment opportunity signals that the new manager may not be able to secure adequate funding
10 opportunities and ultimately sufficient returns. That signal will drive the public pension funds
11 away from that new manager, severely damaging its ability to grow if not participate at all. Being
12 highly conservative and possibly barred legally from doing so, public pension funds will be less
13 or even unwilling to risk further capital with an ineffective manager.

14 52.  Macquarie is an established bank, but prior to July 2005 its private equity fund of
15 funds business did not directly advise United States public pension funds with regard to private
16 equity investments. In July 2005, Macquarie sought to enter the United States public pension
17 fund investment management business. As part of that effort, Macquarie sought to develop a
18 track record by investing commitments from GESB, with whom Macquarie had a contractual
19 relationship since 2002. At this time, Macquarie did not have any United States public pension
20 fund clients. Macquarie's strategy was to employ multiple devices to induce United States public
21 pension funds to hire Macquarie as an investment manager and move capital away from existing,
22 entrenched managers. These included offering reduced fees and greater service. One of their first
23 efforts as a new public pension fund investment manager was to secure participation in a new life
24 sciences fund managed by Aisling.

25 53.  In or about August 2005, Macquarie approached Aisling to seek access to Aisling
26 funds, and specifically the Aisling Capital II, LP fund (the "Aisling Fund"), on behalf of its
27 investors, the Macquarie Private Capital Group ("MPCG") and GESB. Aisling responded
28 positively. After extensive negotiations, Aisling indicated and Macquarie reasonably expected to

1  receive a commitment of at least $15 million in the Aisling Fund.  Macquarie initially offered to
2  invest up to $20 million.

3      54.    Upon information and belief, PCG represents some of the largest pension funds in
4  the United States including the New York City Employees' Retirement System, Teachers'
5  Retirement System of the City of New York, New York City Police Pension Fund Subchapter 2,
6  New York City Fire Department Pension Fund Subchapter 2 (collectively, the "New York
7  Investors"), California Public Employees Retirement Systems, Illinois Teachers' Retirement
8  Systems, Ohio Public Employees' Retirement System, Oregon Public Employees Retirement
9  Fund, and Rhode Island State Investment Commission (together with the New York Investors, the
10 "Funds").  Upon further information and belief, the Funds are responsible for investing billions of
11 dollars in capital of their participants' retirement funds, and they can commit any part of that
12 capital for investment by PCG.  Upon information and belief, PCG also sought access to the
13 Aisling Fund on behalf of the Funds.

14     55.    On or about November 9, 2005, Jan Hoerrner ("Hoerrner"), Aisling's Director of
15 Investor Relations and Marketing, telephoned Fratus, a Macquarie Associate Director based in
16 Carlsbad, California, concerning Macquarie's investment in the Aisling Fund.  Upon information
17 and belief, Hoerrner was and is based out of Aisling's New York, New York office.

18     56.    Hoerrner told Fratus that she had received a call on or about November 9, 2005
19 from Monte Brem, the then-President of PCG.  According to Hoerrner, Brem called Aisling in
20 New York and told Aisling not to allow Macquarie into the Aisling Fund, that PCG should be
21 given priority over Macquarie, and it was understood that, if Aisling allowed Macquarie into the
22 Aisling Fund, PCG would not recommend Aisling's funds to any of PCG's New York Investors.
23 That effectively meant that Aisling would lose access to PCG's pension funds and their billions of
24 dollars in capital if Aisling dealt with Macquarie in any meaningful way.

25     57.    Upon information and belief, Aisling feared the loss of PCG and the significant
26 capital its public pension funds held, and in response to PCG's coercion and threats, Aisling
27 succumbed to PCG's threats and agreed to reduce Macquarie's $15 million investment in the
28 Aisling Fund to $5 million – a reduction of 66 percent.

58. The loss of the investment opportunity in the Aisling Fund damaged Macquarie's ability to achieve its business objectives. It signaled to investors that Macquarie did not have access to and could not secure meaningful investments for its clients.

59. Upon information and belief, PCG received a large commitment to the Aisling Fund on behalf of its New York Investors following its November 9, 2005 call to Aisling.

60. Essentially, PCG orchestrated a concerted refusal to deal designed to stifle Macquarie at a critical moment in its entry. To demonstrate its capacity to serve public pension funds, Macquarie had to establish that it had access to and could secure meaningful investments for its clients. By inducing Aisling to reduce Macquarie's subscription significantly after Aisling had already indicated the allocation Macquarie would obtain, PCG damaged Macquarie's burgeoning reputation in the investment community. By damaging Macquarie's reputation at this critical initial stage in its entry into public pension fund investment management, PCG ensured that Macquarie's competitive position would be harmed.

61. PCG coerced Aisling into refusing to deal with Macquarie. PCG acted in concert with the Funds to refuse to deal with Aisling.

62. Upon information and belief, PCG circulated rumors in the marketplace that Macquarie was having difficulties getting access to funds like Aisling's.

63. Following, and as a result of, PCG's initial anticompetitive conduct with respect to Aisling and PCG's other anticompetitive conduct, Macquarie failed to receive allocations from several public pension funds from which it had sought allocations.

64. Upon information and belief, PCG's actions were designed to damage Macquarie so that Macquarie could not compete for public pension fund customers. Upon information and belief, PCG knew that the Aisling investment was one of Macquarie's first investments as a public pension fund investment manager and knew that by inducing Aisling to reduce Macquarie's subscription signficantly, PCG would damage Macquarie's reputation and inhibit Macquarie's ability to enter into public pension fund investment management for a significant period of time. By so damaging Macquarie's reputation, PCG would be able to maintain and extend its dominance in public pension fund investment management services.

65. Macquarie offered lower fees than PCG and superior customer service to PCG, among other things. By preventing Macquarie's entry and expansion into public pension fund investment management services, PCG will be able to sustain higher fees to its funds and offer lower quality of service. Macquarie and its investors and consumers in general will suffer significant financial harm from the absence of an effective alternative to PCG. PCG has harmed competition through this concerted refusal to deal.

66. The relevant market consists of investment management services to public pension funds (the "Relevant Market").

67. PCG has market power in the Relevant Market. PCG can exclude competition, raise prices and lower output. By preventing Macquarie from competing effectively in the Relevant Market, PCG will maintain or extend its market power in the Relevant Market.

68. PCG is engaged in business that affects or is within the flow of interstate and foreign commerce. The effect of that business on interstate and foreign commerce is substantial.

69. PCG engaged in a concerted refusal to deal in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70. PCG engaged in a contract, combination or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

71. Macquarie suffered injury and damage as a consequence of PCG's anticompetitive activities in violation of Section 4 of the Clayton Act, 15 U.S.C. 15(a).

72. Competition was harmed as a consequence of PCG's activities.

73. PCG's statements to Aisling regarding Macquarie's business were especially harmful to Macquarie because they directly concerned and impugned Macquarie's reputation. A financial services firm's reputation is its most valuable asset and is essential to compete. Impugning that reputation is likely to cause irreparable damage.

74. PCG's statements to Aisling were directly harmful to public consumers on whose behalf Macquarie was seeking to invest in the Aisling Fund because PCG's actions deprived those consumers of full and fair access to the Aisling Fund; as a result, they suffered significant financial harm.

1     75.    Upon information and belief, PCG made its coercive statements to Aisling with malice, knowing that such statements were calculated to harm not only public consumers, but to specifically damage the reputation and business of Macquarie, and deliberately intending to cause that harm. Upon further information and belief, because both PCG and Macquarie are and were engaged in the financial services industry in which reputation and access to funds are essential to compete, PCG knew and intended at the time it made the coercive statements to Aisling that those statements would harm Macquarie and its investors not only with respect to the Aisling Fund, but with respect to future funds to which Macquarie and its investors desired access.

F.     <u>PCG Obtains Macquarie's Confidential Documents And Uses Them Without Macquarie's Knowledge Or Consent, To Macquarie's Detriment</u>

76.    PCG, without Macquarie's knowledge or consent, obtained confidential documents belonging to Macquarie.

77.    PCG's CA Complaint references confidential information relating to Macquarie's business. The CA Complaint quotes from a confidential, internal Macquarie e-mail, sent from Brakey to Martenson, Becker and Fratus. Macquarie never provided, nor authorized any person to provide, its confidential documents (including the referenced e-mail) to PCG or anyone outside of Macquarie.

FIRST CLAIM FOR VIOLATION OF

<u>SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)</u>

(Count One -- By MBL Against Pacific Corporate Group)

78.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 77 with the same force and effect as if fully set forth at length herein.

79.    PCG's actions constitute an unreasonable restraint on trade and commerce among the States and foreign nations in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

80.    As a result of the foregoing, Macquarie has suffered damages in an amount to be determined at trial, which amount is in excess of $25,000,000.00 exclusive of interest and costs.

81.    As a further result of the foregoing, Macquarie is entitled to treble damages, attorneys' fees, costs and interest pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

SECOND CLAIM FOR VIOLATION OF

GBL § 349 (DECEPTIVE ACTS AND PRACTICES)

(Count Two -- By MBL Against PCG)

82. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 81 with the same force and effect as if fully set forth at length herein.

83. Defendant's statements to Aisling were deceptive acts or practices of a recurring nature, harmful to the public at large, and therefore constitute a violation of N.Y. Gen. Bus. Law ("GBL") § 349, entitling Macquarie to a private right of action.

84. As a result of the foregoing, Macquarie has suffered damages in an amount to be determined at trial, which amount is in excess of $25,000,000.00 exclusive of interest and costs.

THIRD CLAIM FOR TORTIOUS

INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

(Count Three -- By MBL Against PCG)

85. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 84 with the same force and effect as if fully set forth at length herein.

86. Defendant, knowing of Macquarie's prospective contract with Aisling, intentionally and by wrongful, improper and tortious conduct, interfered with such prospective contract for the purpose of harming Macquarie.

87. As a result of the foregoing, Macquarie has suffered damages in an amount to be determined at trial, which amount is in excess of $25,000,000.00 exclusive of interest and costs.

FOURTH CLAIM FOR CONVERSION

(Count Four -- By MBL Against PCG)

88. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 87 with the same force and effect as if fully set forth at length herein.

89. Defendant intentionally interfered, and continues to interfere, with Macquarie's right of possession of Macquarie's own confidential documents.

90. Said confidential documents are, and have always been, the exclusive property of Macquarie, and have never been the property of Defendant.

1    91.     Nonetheless, Defendant has, upon information and belief, improperly obtained
2  certain of Macquarie's confidential documents from Martenson and retained them for its own use,
3  without the permission of Macquarie, and to the exclusion of and in defiance of Macquarie's
4  rights.

5    92.     As a result of the foregoing, Macquarie has suffered damages in an amount to be
6  determined at trial, which amount is in excess of $75,000.00 exclusive of interest and costs.

7                              DECLARATION SOUGHT
8                         AND PROPRIETY OF DECLARATION
9                            (By All Plaintiffs Against PCG)

10    93.    In order to resolve this controversy, Plaintiffs request that, pursuant to 28 U.S.C.
11  §2201, this Court declare the respective rights and duties of the parties in this matter and, in
12  particular, that the Court declare that Plaintiffs are not liable under any of the Theories of
13  Liability or for violating any of these statutes, California Penal Code §§ 502, 529, 530.5, 538(a),
14  Business and Professions Code § 17200, because Martenson acted individually, outside the scope
15  of his employment, without the knowledge or consent of the Plaintiffs, and without being
16  engaged in a conspiracy with the Plaintiffs to cause damages to PCG when he sent the four e-
17  mails attached to PCG's complaint, and because Plaintiffs engaged in no conspiracy or deceit as
18  against PCG nor caused PCG any damage or harm.

19    94.    A valid case or controversy exists sufficient for this court to declare the rights and
20  remedies of the parties in that PCG has incorrectly asserted facts in its complaint and has
21  wrongfully alleged that Plaintiffs have violated numerous state statutes.

22    95.    Plaintiffs have the requisite standing to request this declaration in that PCG, after
23  informing Plaintiffs of its intent to sue them and after Plaintiffs commenced this action,
24  subsequently commenced an action in the Superior Court of California for the County of San
25  Diego seeking damages in an amount to be determined at trial, which PCG has informed
26  Plaintiffs it estimates at $25,000,000.00 for violating various state statutes.

27    96.    This controversy is ripe for determination at this time because PCG threatened to
28  commence and, almost seven weeks after Plaintiffs commenced this action, PCG commenced an

1  action in the Superior Court of California for the County of San Diego. The subsequently-filed
2  California action would require Plaintiffs to expend great costs and expense in defending against
3  that action, and accordingly, Plaintiffs have moved the California court for an order dismissing or
4  staying that action in favor of this first-filed action.

**PRAYER FOR RELIEF**

6  WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

7  A. All Plaintiffs seek a declaratory judgment providing that Plaintiffs are not liable
8  under any of the Theories of Liability or for violating any of these statutes, California Penal Code
9  §§ 502, 529, 530.5, 538(a), California Business and Professions Code § 17200, because
10  Martenson acted individually, outside the scope of his employment, without the knowledge or
11  consent of the Plaintiffs, and without being engaged in a conspiracy with the Plaintiffs to cause
12  damages to PCG when he sent the four e-mails attached to PCG's complaint, and because
13  Plaintiffs engaged in no conspiracy or deceit as against PCG nor caused PCG any damage or
14  harm; and

15  B. On Count One, for violating the Sherman Act (15 U.S.C. § 1), MBL seeks
16  compensatory damages against PCG in an amount to be determined at trial, which amount is in
17  excess of $25,000,000.00 exclusive of interest and costs, and for treble damages and attorneys'
18  fees, costs and interest all as provided for by Section 4 of the Clayton Act (15 U.S.C. § 15(a));

19  C. On Count Two, for committing deceptive acts and practices in violation of GBL
20  § 349, MBL seeks compensatory damages against PCG in an amount to be determined at trial,
21  which amount is in excess of $25,000,000.00 exclusive of interest and costs;

22  D. On Count Three, for PCG's tortious interference with prospective economic
23  relationships, MBL seeks compensatory damages in an amount to be determined at trial, which
24  amount is in excess of $25,000,000.00 exclusive of interest and costs;

25  E. On Count Four, for conversion, MBL seeks compensatory damages in an amount
26  to be determined at trial, which amount is in excess of $75,000.00 exclusive of interest and costs,
27  as a result of PCG's conversion of Macquarie's confidential documents and information;

28  F. MBL seeks punitive damages arising out of defendant's malicious, willful, wanton

1  and egregious conduct directed at Macquarie and at the public generally;

2      G.    MBL seeks the costs and disbursements of this action, including attorneys' fees;

3  and

4      H.    All Plaintiffs seek such other and further relief as this Court may deem just and

5  proper.

Dated: November 26, 2008               ARENT FOX LLP

By:   /s/ Debra J. Albin-Riley
Debra J. Albin-Riley
Attorneys for Plaintiffs
MACQUARIE GROUP LIMITED,
MACQUARIE BANK LIMITED, DAVID
CLARKE, ALLAN MOSS, RICHARD
SHEPPARD, BEN BRUCK AND JOHN
BRAKEY

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: November 26, 2008               ARENT FOX LLP

By:   /s/ Debra J. Albin-Riley
Debra J. Albin-Riley
Attorneys for Plaintiffs
MACQUARIE GROUP LIMITED,
MACQUARIE BANK LIMITED, DAVID
CLARKE, ALLAN MOSS, RICHARD
SHEPPARD, BEN BRUCK AND JOHN
BRAKEY