1

2

3

4

5

6                         **UNITED STATES DISTRICT COURT**

7                       **SOUTHERN DISTRICT OF CALIFORNIA**

8

9   MACQUARIE GROUP LIMITED; DAVID            CASE NO. 08cv2113 - IEG - WMC
    CLARKE; ALLAN MOSS; RICHARD
    SHEPPARD; BEN BRUCK; JOHN                 ORDER:
10  BRACKEY,                                  (1) DENYING DEFENDANT'S
                                              MOTION TO DISMISS OR STRIKE
11                             Plaintiff,     [Doc. No. 11]

12           vs.                              (2) GRANTING DEFENDANT'S
                                              MOTION TO DISMISS THE
13                                            REQUEST FOR  DECLARATORY
    PACIFIC CORPORATE GROUP, LLC,             JUDGMENT
14                                            [Doc. No. 12]
                               Defendant.
15

16           Before the Court are defendant's Rule 12(b)(6) motion to dismiss, Rule 12(f) motion to strike,

17   and motion to stay the action.  (Doc. Nos. 11 and 12.)  Plaintiffs opposed and defendant filed a reply.

18                                       **BACKGROUND**

19           The following factual background is drawn from plaintiffs' first amended complaint.  All facts

20   alleged are taken as true for the limited purposes of this motion.

21   **A.      Parties**

22           Plaintiff  Macquarie  Group  Limited  ("MGL")  and  plaintiff  Macquarie  Bank  Limited

23   ("Macquarie") are Australian corporations with principal places of business in Sydney, Australia.

24   Macquarie is a wholly owned subsidiary of MGL.  Plaintiff Allan Moss was the Managing Director

25   and Chief Executive of Macquarie until November 2007, when he became the Managing Director and

26   Chief Executive of MGL.  Plaintiff Ben Bruck was the Head of Macquarie Funds Management Group,

27   a business division within MGL.  Plaintiff Jeff Blakely was the head of Macquarie Funds Management

28   Group's Alternative Investments private equity management business.  Defendant, Pacific Corporate

1   Group, is a Delaware limited liability corporation with its principal place of business in La Jolla,

2   California.  Defendant also maintains an office in New York, New York.

3   **B.      Facts Underlying the Request for Declaratory Relief**

4          In October 2006, Peter Martenson, an employee of a MGL subsidiary, allegedly sent e-mail

5   messages to a number of defendant's employees in which he falsely identified the author of the emails

6   as defendant's chairman, Christopher Bower.  Martenson also sent an email to Dow Jones reporter

7   Laura Kreutzer, in which he falsely identified the email's author as defendant's former president.  In

8   these emails, Martenson purported to transmit disparaging information about defendant gathered from

9   the website of one of defendant's clients.

10         In January 2008, defendant notified plaintiffs it intended to bring claims for violations of

11  various federal and state laws arising from Martenson's conduct.  Defendant presented plaintiffs with

12  a proposed complaint, which defendant intended to file in the Superior Court of the State of California

13  for the County of San Diego ("draft complaint").  (FAC, Ex. A.)  In the draft complaint, defendant

14  claimed plaintiffs were responsible for Martenson's conduct and conspired with Martenson to damage

15  defendant.  Defendant's draft complaint alleged $25 million in damages.  Plaintiffs commenced this

16  action in the Southern District of New York on April 7, 2008.  Defendant filed a complaint in the

17  Superior Court of the State of California for the County of San Diego on May 23, 2008.

18  **C.      The Alleged Refusal To Deal**

19         The alleged refusal to deal stems from plaintiffs' attempted entry into the investment

20  management services for public pension funds market in 2005.  A pension fund is a pool of assets

21  bought with contributions made under a pension plan.  When an employee retires, she receives

22  payment from the pension fund.  Pension plans funded by governments are pubic pension funds.

23         Public pension funds have trillions of dollars in capital to invest on behalf of their

24  beneficiaries.  These funds are highly risk averse and are often restricted by complicated laws and

25  regulations governing how the public pension fund can invest.  Most of the funds have extensive

26  internal rules and regulations which require a public pension fund investment manager to develop

27  highly specialized knowledge and understanding.

28         Before hiring a manager, public pension funds engage in extensive due diligence, including

1   a review of the manager's track record.  Reputation is therefore essential to secure investment

2   business.  Part of this reputation is premised on a new investment manager's first investments.  The

3   ability to acquire initial investment opportunities will have a disproportionately high impact on the

4   investment manager's ability to enter the market.  For example, an investment manager's initial

5   inability to secure access to significant investment opportunities signals the new manager may not be

6   able to secure adequate, long-term investment returns.

7        In July 2005, Macquarie attempted to enter the public pension fund investment management

8   market.  As part of the effort, Macquarie attempted to secure the business of the Government

9   Employees Superannuation Board ("GESB").  In August 2005, Macquarie approached Aisling Capital

10  LLC ("Aisling"), a life science venture capital fund manager with an office in New York, New York.

11  Aisling was amenable to dealing with Macquarie and indicated Macquarie would receive a

12  commitment of at least $15 million in the Aisling fund.

13       On November 9, 2005, Jan Hoerrner, Aisling's Director of Investor Relations and Marketing,

14  telephoned Macquarie concerning Macquarie's investment in the Aisling fund.  Hoerrner told

15  Macquarie she had received a call on November 9, 2005 from defendant's president.  Defendant's

16  president told Aisling to not allow Macquarie into the Aisling Fund, requested priority over Macquarie

17  in the fund, and threatened to not recommend Aisling to clients if Macquarie entered the fund.  Aisling

18  subsequently lowered Macquarie's investment opportunity from $15 million to $5 million.

19       This reduction in investment opportunity signaled to investors Macquarie could not secure

20  meaningful investments for its clients.  Plaintiffs allege defendant knew the importance of this

21  investment opportunity and coerced Aisling into reducing the opportunity to prevent Macquarie's

22  entry into the market.  Subsequently, defendant circulated rumors in the marketplace that Macquarie

23  was having difficulties getting access to funds like Aisling's.  As a result, Macquarie failed to receive

24  allocations from several public pension funds.

25       Defendant's conduct damaged not only Macquarie, but also the market.  Macquarie offered

26  lower management fees.  Therefore, by preventing Macquarie's entry into the market, defendant was

27  able to sustain higher fees and offer lower quality service.  Macquarie, as well as consumers in

28  general, suffered financial harm from defendant's acts.

1    Further, without Macquarie's consent, defendant obtained confidential documents belonging

2    to Macquarie.  For example, defendant's California complaint quotes a confidential email.

3    **D.    Procedure**

4    On October 31, 2008, Judge Castel transferred this case from the Southern District of New

5    York to the Southern District of California pursuant to 28 U.S.C. § 1404(a).  On November 26, 2008,

6    plaintiffs filed a first amended complaint, alleging defendant (1) violated section 1 of the Sherman

7    Act; (2) violated New York General Business Law § 349 (deceptive acts and practices); (3) tortiously

8    interfered with prospective economic relations; and (4) committed conversion. Plaintiff also requests

9    declaratory judgment arising from the Martenson incident.  On December 15, 2008, defendant filed

10   (1) a motion to strike portions of the first amended complaint and (2) a motion to dismiss or stay the

11   action.  (Doc. Nos. 11, 12.)  Plaintiffs filed an opposition and defendant replied.

12                                    **LEGAL STANDARD**

13   **A.    Motion to Dismiss**

14   A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the

15   claims asserted in the complaint.  Fed. R. Civ. P. 12(b)(6).  To avoid a Rule 12(b)(6) dismissal, a

16   complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a

17   claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S.544 (2007). The

18   court's review is limited to the contents of the complaint and must accept all factual allegations pled

19   in the complaint as true, drawing all reasonable inferences from them in favor of the nonmoving party.

20   Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir.1996).  In spite of this deference, it

21   is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not

22   alleged." Associated General Contractors of California, Inc. v. California State Council of Carpenters,

23   459 U.S. 519, 526 (1983).  Furthermore, a court is not required to credit conclusory legal allegations

24   cast in the form of factual allegations, unwarranted deductions of fact, or unreasonable inferences.

25   Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

26   **B.    Motion to Strike**

27   Rule 12(f) permits the court to strike any "redundant, immaterial, impertinent, or scandalous

28   matter." Fed. R. Civ. P. 12(f).  Motions to strike are a drastic remedy and generally disfavored.  5C

Wright & A. Miller, Federal Practice and Procedure §1380 (3d ed. 2004).  A matter is impertinent if the statements do not pertain, and are not necessary, to the issues in question.  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993) rev'd on other grounds 510 U.S. 517 (1994).  "Scandalous" matters "casts a cruelly derogatory light on a party or other person."  In re 2TheMart.com, Inc. Sec. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000); see, e.g. Jacobsen-Wayne v. Calvin C.M. Kam, M.D., Inc., 198 F.3d 254 (9th Cir. 1999) (striking the words "date rape" and "rape" from a reply brief in a case arising from a medical examination); Alvarado-Morales v. Digital Equip. Corp., 843 F.2d 613 (1st Cir. 1988) (striking the terms "concentration camp," "brainwashing," and "torture" in a tort case in the employment context).

## DISCUSSION

**A.      Motion to Dismiss Sherman Act Claim**

Plaintiffs allege a vertical agreement between defendant and Aisling, through which defendant attempted to bar plaintiffs' entry into the market for investment management for public pension funds.[1]  Defendant allegedly knew a failure to procure initial investment opportunities would be a barrier to market entry and knew of plaintiffs' relationship with Aisling.  Defendant allegedly called Aisling and asked the company to reduce plaintiffs' investment opportunity.  Aisling subsequently reduced plaintiffs' opportunity from $15 million to $5 million.  Further, defendant allegedly spread rumors regarding plaintiffs' ability to procure investment opportunities.  Plaintiffs contend this, coupled with the reduction of their investment opportunity, effectively barred their entry into the market.

Section 1 of the Sherman Act states, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . is declared to be illegal."  15 U.S.C. § 1.  Because many beneficial business contracts restrain trade, courts interpret section 1 to prohibit only those that are "unreasonably restrictive of competitive conditions."  Standard Oil Co. v. United States, 221 U.S. 1 (1911).  To prevail on an section 1 claim, a plaintiff must prove three elements: (1) an agreement or conspiracy intended to restrain trade; (2) which actually restrains trade; and (3) which causes an

---

[1] A "vertical agreement" is an agreement between entities operating on different marketing levels.  A prototypical example would be an agreement between a manufacturer and a distributor.

1   injury to competition. <u>Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n</u>, 884 F.2d 504, 507 (9th

2   Cir.1989).  Further, the plaintiff must establish both the relevant market and market power.  <u>See</u>

3   <u>Newcal Industries, Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1045 (9th Cir. 2008).

4        If the plaintiffs establish these elements, the Court must determine whether to implement the

5   *per se* rule or the "rule of reason."  <u>See</u> <u>Paladin Assocs., Inc. v. Montana Power Co.</u>, 328 F.3d 1145,

6   1154 (9th Cir.2003).  *Per se* liability is reserved for those agreements "so plainly anticompetitive that

7   no elaborate study of the industry is needed to establish their illegality." <u>National Soc. of Professional</u>

8   <u>Engineers v. United States</u>, 435 U.S. 679, 692 (1978).  An agreement between a single customer and

9   a single supplier to terminate a second supplier is not unlawful *per se*.  <u>NYNEX Corp. v. Discon</u>, 525

10  U.S. 128 (1998).  Therefore, the Court analyzes this type of vertical agreement using the rule of

11  reason.  <u>A.H. Cox & Company v. Star Machinery Co.</u>, 653 F.2d 1302, 1305-6 (9th Cir. 1981). The rule

12  of reason requires the Court to "weigh the anticompetitive effects and the procompetitive effects or

13  business justifications advanced for the challenged restraint to determine whether it is unreasonable."

14  <u>Les Shockley</u>, 884 F.2d at 507.  Below, the Court evaluates whether plaintiffs meet the section 1

15  elements before applying the rule of reason.

16  **1.        Agreement or Conspiracy**

17  <u>i.</u>        Parties' Argument

18       Defendant argues plaintiffs cannot show an agreement because the facts alleged do not exclude

19  the possibility defendant and Aisling Capital each acted independently.  Defendant notes that,

20  generally, a market participant may freely choose his clients, citing <u>Monsanto Co. v. Spray-Rite</u>

21  <u>Service Corp.</u>, 465 752, 761 (1984)("A distributor is free to acquiesce in the manufacturer's demand

22  in order to avoid termination."); <u>Sorisio v. Lenox, Inc.</u>, 701 F. Supp. 950, 956 (D. Conn.

23  1988)("[P]ersuasion, pressure, even argument, is permissible."); <u>America Channel, LLC v. Time</u>

24  <u>Warner Cable, Inc.</u>, 2007 WL 1892227 at *5 (D. Minn. June 28, 2007)("allegations regarding [the

25  defendant's] refusal to deal are insufficient to allege a claim of conspiracy because . . . they fail . . .

26  to exclude the possibility of independent action.").

27       Plaintiffs argue coerced conduct satisfies the joint conduct requirement, citing <u>Spectators'</u>

28  <u>Commc's Network v. Colonia Country Club</u>, 253 F.3d 215, 225 (5th Cir. 2001); <u>MCM Partners, Inc.</u>

v. Andrews-Bartlett & Assoc., 62 F.3d 967, 973-74 (7th Cir. 1995); Pinhas v. Summit Health, Ltd., 894 F.2d 1024 (9th Cir. 1990); Oltz v. St. Petter's Cmty. Hosp., 861 F.2d 1440, 1445 (9th Cir. 1988).

ii.     Analysis

For an agreement to constitute a restraint of trade, plaintiffs must show the conspirators had "conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984).  The agreeing parties need not share a motive and "acquiescence in an illegal scheme is as much a violation of the Sherman act as the creation and promotion of one."  Spectators', 253 F.3d at 221.  An agreement to exclude a competitor from the market has been widely found to be a unlawful objective.  See Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207 (1959); Quemos Theatre Co. v. Warner Bros. Pictures, 35 F. Supp. 949 (D.C.N.J. 1940).

In Spectator's, the Fifth Circuit found an agreement when one conspirator was allegedly "enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive."  Id. at 222.  In that case, the plaintiff alleged the PGA Tour, in an attempt to drive a competitor out of the on-site radio broadcast market, pressured Anheuser-Busch to withdraw sponsorship from a competitor's radio broadcast.  Id. at 221.  After Anheuser-Busch rescinded the agreement, its product became the official beer of the PGA Tour.  Id.  The Fifth Circuit found this circumstantial connection sufficient to survive a motion to dismiss.

In the instant case, plaintiffs sufficiently allege an agreement with an unlawful object.  The agreement between the parties is evidenced by defendant's alleged phone call to Aisling and Aisling's subsequent reduction of plaintiffs' investment opportunity.  Like the court in Spectator's, this Court may infer an agreement between the parties from this circumstantial evidence for the limited purposes of this motion.  Further, the agreement was intended to exclude plaintiffs from the market, a clearly unlawful object.  Plaintiffs satisfy the agreement element.

The cases cited by defendant are irrelevant because they involve either a different type of antitrust violation or are factually distinct.  Monsanto, 465 U.S. 752 (evaluating a vertical price-fixing agreement); Sorisio, 701 F. Supp. at 956 (same); American Channel, 2007 WL 1892227 at *5 (evaluating a vertical refusal to deal in which the plaintiff only alleged parallel conduct without any

other proof of agreement).[2]  In the instant case, plaintiffs allege an explicit agreement, evidenced by an admission by one of the co-conspirators and supported by circumstantial proof.

**2.      Restraint on Trade**

i.      Parties' Argument

Defendant argues plaintiffs fail to articulate a plausible restraint on trade.  Instead, defendant argues, this case involves a supplier choosing to deal with one prospective purchaser instead of another, an act that is presumptively legal absent extraordinary market power.  Republic Tobacco Co. v. North Atlantic Trading Co., Inc., 381 F.3d 717, 736 (7th Cir. 2004); E&L Consulting Ltd. v. Dorman Industries Ltd., 472 F.3d 23, 29 (2d Cir. 2006).  Plaintiffs, defendant argues, are complaining of too much competition because defendant received a larger share of the Aisling fund.

Plaintiffs allege defendant harmed competition by barring plaintiffs' entry into the investment management services for public pension funds market.  According to plaintiffs, this market is concentrated in a few firms and has "high entry barriers."  One of these barriers is a lack of confidence in new investment managers – which hinges, in part, on the manager's ability to secure initial investment opportunities.  Allegedly, defendant ensured plaintiffs would not clear this barrier by depriving them of the full Aisling investment opportunity.  Accordingly, plaintiffs have been unable to enter the market and defendant has been able to charge higher fees and offer lesser service.

ii.      Analysis

"Not every agreement is *per se* 'in restraint of trade' within the meaning of section 1." Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71,76 (9th Cir. 1969).  A single seller may unilaterally transfer his business to a competitor without violating the antitrust laws.  Id. However, a refusal to deal where "there was a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective" is a restraint on trade.  Id.; see, e.g., United States v. General Motors Corp., 384 U.S. 127 (1966)(finding a section 1 violation when the objective was to put "discounters" out of business); Silver v. New York Stock Exchange, 373 U.S. 341

---

[2] "Parallel conduct" refers to the inference of agreement or concerted action which a Court may draw from "the conscious parallelism of the defendants' acts of price cutting and the like."  54 Am. Jur. 2d Monopolies § 486.  Parallel conduct alone, as opposed to explicit agreements, has widely been held insufficient to maintain an antitrust claim.  Id.

1  (1963)(finding a section 1 violation when a group worked to put a competitor out of business or, at

2  least, impair their ability to compete); Quemos Theatre Co., Inc. v. Warner Bros. Pictures, 35 F. Supp.

3  949 (D.C.N.J. 1940).

4        At this stage in the proceedings, plaintiffs sufficiently allege defendant's vertical agreement

5  with Aisling was a restraint on trade.  Defendant allegedly pressured Aisling to reduce plaintiffs'

6  investment opportunity in order to prevent their entry into the market, which is a form of a refusal to

7  deal.  Defendant's alleged anticompetitive motive is further evidenced by the rumors it allegedly

8  spread about plaintiffs' inability to obtain investment opportunities.  These agreements restrain trade

9  by reducing the number of participants in the market and, as a result, plaintiffs allege defendant is able

10  to charge supracompetitive prices.  Evaluating the totality of these allegations, the Court concludes

11  plaintiffs sufficiently allege a restraint on trade.

12  **3.      Injury to Competition (Anti-Trust Injury)**

13        Defendant alleges plaintiffs do not properly alleged an injury to competition.  A plaintiff must

14  allege more than an injury to itself, it must allege an injury to the marketplace as a whole.  Brunswick

15  Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477 (1977).  The complaint alleges defendant's actions

16  allowed it "to sustain higher fees and offer lower quality of service . . . and consumers in general will

17  suffer significant financial harm from the absence of an effective alternative to [defendant]."  (FAC

18  ¶65.)  This allegation of supracompetitive prices is sufficient to satisfy the injury to competition

19  requirement at this stage of the proceedings.  See Rebel Oil Co, Inc. v. Atl. Richfield Co., 51 F.3d

20  1421, 1424 (9th Cir. 1995) (noting evidence of "restricted output and supracompetitive prices" is proof

21  of injury to competition.).

22  **4.      Relevant Market**

23  i.      Parties' Arguments

24        Defendant argues there is no relevant market because "investment management services to

25  public pension funds" are indistinguishable from general investment management services.  According

26  to defendant, there are hundreds of thousands of professionals who could potentially provide services

27  to public pension funds.  Given this vast potential market, defendant argues plaintiffs fail to plead

28  sufficient facts other than conclusory allegations of market, citing as an example Rick-Mik

Enterprises, Inc. v. Equilon Enterprises LLC, 532 F.3d 963 (9th Cir. 2008).

Plaintiffs argue the relevant market is investment management services for public pension funds. This is typically a factual rather than a legal element. Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008). At this stage, plaintiffs argue defendant cannot defeat a well-pleaded complaint by counter-pleading another relevant market.

ii.     Analysis

To state a valid Sherman Act claim, plaintiffs must allege "a 'relevant market' exists." Newcal Industries, Inc. v. Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008). A complaint survives a Rule 12(b)(6) motion "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." Id. at 1045. Determination of the existence of a relevant market is generally a factual question, but there are some legal requirements. Plaintiffs must allege both a geographic market and a product market. The product "market must encompass the product at issue as well as all economic substitutes for the product." Id. at 1046.

Here, plaintiffs have alleged a plausible geographic and product market – the United States market for investment management of public pension funds. Plaintiffs allege this market is highly regulated, with a limited number of investment opportunities available due to the regulation; therefore, there are few economic substitutes. Although a factual inquiry may test the legitimacy of the market, it is not appropriate for determination at the motion to dismiss stage.

**4.     Market Power**

i.     Parties' Arguments

Defendant argues plaintiffs do not allege market power. Defendant contends, even if it had frozen plaintiffs out of the market, "exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45 (1984)(requiring market share greater than 30%). Plaintiffs aver defendant's ability to exclude competition proves its market power.

ii.     Analysis

"Market power may be demonstrated through . . . direct evidence of the injurious exercise of market power." Rebel Oil, 51 F.3d at 1421. Plaintiffs allege defendant manages billions of dollars

1    for large, public pension funds.  Defendant allegedly exercised its market power to exclude plaintiffs

2    from the market, which is direct evidence of the injurious exercise of market power.

3            Defendant's citation to <u>Jefferson Parish Hosp.</u> is unpersuasive.  That case involved a tying

4    agreement, which occurs when a monopolist attempts "to use a tie-in to a product to extend its

5    monopoly power into a second market . . . ."  Herbert Hovenkamp, <u>Federal Antitrust Policy: The Law</u>

6    <u>of Competition and its Practice</u> § 7.8 (3d ed 2005).  Under antitrust law, tying agreements are analyzed

7    under a different rubric than refusals to deal.  <u>See generally</u> <u>id.</u>

8    **5.      Weighing the Procompetitive and Anticompetitive factors**

9            In general, courts find vertical agreements "among traders at different marketing levels,

10   designed to exclude from the market direct competitors" to be impermissible.  <u>See</u> 10A <u>Fletcher Cyc.</u>

11   <u>Corp.</u> § 5007 (collecting cases).  When a large appliance dealer used its purchasing power to induce

12   manufacturers to sell at a higher price to competing appliance dealer, the effect of the agreement was

13   unlawful because it drove the competitor out of business.  <u>Klor's Inc. v. Broadway-Hale Stores</u>, 359

14   U.S. 207 (1959).  The exclusion of competitors from the market place has the anticompetitive effect

15   of allowing defendant to charge supracompetitive prices and, additionally, reduces consumer options.

16           The procompetitive factor involved is the freedom of a party to choose one client over another.

17   The freedom of choice is a fundamental tenant of a the market system and the antitrust statutes do not

18   restrict the right of any entity to choose with whom it does business.  <u>Shawver & Son, Inc. v.</u>

19   <u>Oklahoma Gas & Elec. Co.</u>, 463 F.2d 204 (10th Cir. 1972).

20           Balancing this freedom of choice against the anticompetitive factors, the Court finds plaintiffs

21   satisfy the rule of reason.  Although businesses are generally free to contract, there is a strong

22   prohibition against agreements designed to prevent entry of a competitor into the market.  Plaintiffs

23   allege they can provide services to public pension funds at a lower price, therefore, its exclusion from

24   the market damages consumers as a whole.  The alleged damage to consumers outweighs the freedom

25   of choice, making this alleged restraint on trade unreasonable.  Accordingly, the Court DENIES

26   defendant's motion to dismiss the antitrust claim.

27   **B.      Motion to Dismiss New York General Business Law § 349 Claim**

28           The complaint alleges defendant's alleged phone call to Aisling constituted a violation of New

York General Business Law § 349.

i.     Parties' Argument

Defendant argues New York General Business Law § 349 is a consumer protection law and not applicable to this factual situation.  First, defendant argues the complaint does not allege an act directed toward any New York consumers.  Second, defendant asserts the phone call between it and Aisling was not deceptive.  Finally, it argues, the damage claimed was to plaintiffs, not consumers.

Plaintiffs contend defendant's actions were consumer-oriented because they deprived New York consumers of access to a lucrative investment opportunity.  Defendant's actions were deceptive because they were intended to deceive the market as to plaintiff's ability to compete for lucrative investment opportunities.  Finally, defendant's actions were misleading toward New York consumers and injured plaintiffs.

ii.     Analysis

Section 349 of new York's General Business Law provides: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. law § 349(a).  To establish prima facie case, plaintiff must demonstrate that: (1) defendant's deceptive acts were directed at consumers, (2) acts are misleading in material way, and (3) plaintiffs have been injured as result. Gristede's Food, Inc. v. Unkechauge Nation, 532 F. Supp.2d 439 (E.D.N.Y. 2007).  There is no dispute plaintiffs allege they were injured as a result, therefore, the Court turns to the other elements.

The first element requires plaintiffs allege a "consumer injury or harm to the public interest." New York v. Feldman, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (citation omitted).  This requirement is construed "liberally." Id.  "[P]laintiffs suing as corporate competitors under §349 must show that defendants allegedly deceptive practice 'affects the public interest of New York.'" Boule v. Hutton, 320 F. Supp. 2d 132, 137 (S.D.N.Y. 2004) (citation omitted).  In Feldman, the court found injury to the public interest when defendants allegedly engaged in a scheme to manipulate public stamp auctions, thereby, "undermin[ing] New York's interest in an 'honest marketplace in which economic activity is conducted in a competitive manner." Feldman, 210 F. Supp. 2d at 302.  In the instant case, plaintiffs allege defendant orchestrated a refusal to deal designed to prevent its entry into

1   the market, thereby, allowing defendant to charge supracompetitive prices.  This undermines New

2   York's interest in an honest marketplace in which economic activity is conducted in a competitive

3   manner.

4           Next, the Court must determine if plaintiffs adequately allege the practice was deceptive or

5   misleading.  "[A] deceptive act or practice has an 'objective definition, . . . limited to those [acts]

6   likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  Leider v. Ralfe,

7   387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005) (quoting Oswego Laborers' Local 214 Pension Fund v.

8   Marine Midland Bank, N.A., 647 N.E.2d 741 (1995)).  In this case, the alleged collusive activity falls

9   within section 349's definition of "deceptive acts or practices."  In Feldman, the court detailed a line

10  of cases applying section 349 "by looking to the definition of deceptive acts under section 5 of the

11  Federal Trade Commission Act."  Feldman, 210 F. Supp. 2d at 302.  The Feldman court noted many

12  courts routinely treated antitrust violations as deceptive acts; therefore, the court found an alleged

13  antitrust violation was a deceptive act for pleading purposes.  Id.  Similarly, this Court finds the

14  particular antitrust violation alleged constitutes a deceptive act for the purposes of section 349.

15  Accordingly, the Court DENIES defendant's motion to dismiss the section 349 claim.

16  **C.      Motion to Dismiss Other State Law Claims**

17  **1.      Choice of Law Issues**

18          As an initial matter, the parties disagree which state's laws govern plaintiffs' tortious

19  interference and conversion claims.  Defendant's motion rests upon the assumption both these claims

20  are governed by California law.  Plaintiffs argue New York law controls.

21          Following a transfer for "convenience" under 28 U.S.C. § 1404(a), the transferee court applies

22  the same substantive rules –  including statute of limitations – that the transferor court would have

23  applied.  Van Dusen v. Barrack, 376 U.S. 612, 637-39 (1964); Muldoon v. Tropitone Furn. Co., 1 F.3d

24  964, 965 (9th Cir. 1993).  However, the law applied will not necessarily be the law of New York, but

25  rather the law a New York court would have applied under a choice of law analysis.  See, e.g., Myelle

26  v. American Cyanamid Co., 57 F.3d 411, 413 (4th Cir. 1995).

27          The first step is to determine whether an actual conflict exists between the laws of the

28  jurisdictions involved.  In re Allstate Ins. Co., 613 N.E.2d 936, 937 (N.Y. 1993).  When no conflict

exists, "the court should apply the law of the forum state in which the action is being heard." <u>Frazier Exton Dev., LP v. Kemper Envtl., Ltd.</u>, 2004 WL 1752580 at * 12 (S.D.N.Y. July 29, 2004).  If there is a conflict, "New York has adopted an 'interest analysis,' which requires . . . 'the law of the jurisdiction having the greatest interest in the litigation ... be applied.'" <u>Kalb, Voorhis & Co. v. American Fin. Corp.</u>, 8 F.3d 130, 132 (2d Cir.1993) (quoting <u>Intercontinental Planning, Ltd. v. Daystrom, Inc.</u>, 248 N.E.2d 576, 582 (1969)).  The most important contacts to consider are "the locus of the tort and the domicile of the parties."  <u>Cooney v. Osgood Mach., Inc.</u>, 179 A.D. 2d 240, 242 (N.Y. App. Div., 1992).  "Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct regulating laws." <u>Krock v. Lipsay</u>, 97 F.3d 640, 646 (2d Cir. 1996).  Interference with prospective economic relations is a conduct regulating law. The locus of the tort is where the last event occurred that triggered liability.  <u>Hamilton v. Accu-Tek</u>, 47 F. Supp. 2d 330, 337 (E.D.N.Y. 1999).

The tortious interference claim is governed by New York law because there is no conflict between New York and California law.[3]  New York requires a plaintiff establish: "(1) the plaintiff had a business relationship with a third party; (2) defendant knew of such relationship and intentionally interfered with it; (3) defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) defendant's actions injured the relationship between plaintiff and third party." <u>Henneberry v. Sumitomo Corp. of America</u>, 415 F. Supp. 2d 423, 467 (S.D.N.Y. 2006).  California requires a plaintiff establish:

> [1] An economic relationship between plaintiff and some third party . . .; [2] The defendant's knowledge of the relationship; [3] Intentional acts by the defendant designed to disrupt the relationship; [4] Actual disruption of the relationship; [5] Economic harm to the plaintiff proximately caused by the acts of the defendant; [6] Conduct that was wrongful by some legal measure other than the fact of interference itself.

5 Witkin, <u>Summary of California Law</u>, Torts, § 742 (10th ed. 2005).  The only arguable difference is California's requirement the act be "wrongful by some other legal measure."  However, this is a false

---

[3]Even if a reviewing court finds a conflict, New York law still controls because the locus of the tort was New York.  The majority of alleged tortious conduct occurred in New York: Aisling received defendant's phone call in New York, decided to reduce plaintiff's subscription in New York, and in fact reduced plaintiff's subscription.

1    distinction as New York defines "improper means" to mean the conduct "must amount to a crime or

2    an independent tort."  Henneberry, 415 F. Supp. 2d at 468 (citation omitted).  Because there is no

3    material difference, a New York court would find New York law controls this claim.

4           The conversion claim is also governed by New York law because there is not conflict between

5    the two potential laws.  The elements of conversion in California are: (1) plaintiff's right of

6    possession; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights;

7    and (3) damages.  Burlesci v. Peterson, 68 Cal. App. 4th 1062 (1998).  The elements of conversion

8    in New York, (1) the plaintiff's right to possession, (2) intent of the defendant, and (3) defendant's

9    interference with plaintiff's property rights to the exclusion of plaintiff's rights.  Meese v. Miller, 436

10   N.Y.S.2d 496 (N.Y. App. Div., 1981).  A New York court would apply New York conversion law.

11          Because there is no true conflict between these laws, rebriefing is unnecessary because

12   defendant's arguments apply with equal vigor to New York law.

13   **2.      Tortious Interference with Prospective Economic Relations**

14          Defendant allegedly interfered with plaintiffs' prospective economic relations by placing a

15   phone call to Aisling, thereby convincing Aisling to reduce plaintiffs' investment opportunity.

16   i.      Parties' Argument

17          As a threshold matter, defendant asserts plaintiffs' claim is time-barred.  Defendant then argues

18   the claim fails because plaintiffs have failed to show the act was independently wrongful, citing Korea

19   Supply Co. v. Lockheed Martin Corp., 29 Cal 4th 1134, 1159 (2003) ("[T]he requirement of pleading

20   that a defendant has engaged in an act that was independently wrongful distinguishes lawful

21   competitive behavior from tortious interference.").  Finally, defendant claims its conduct was fully

22   privileged under the doctrine of competition privilege and California's statutory common interest

23   privilege, California Civil Code § 47(c).

24          Plaintiffs argue the claim is timely under New York law.  Further, plaintiffs argue the

25   complaint alleges the prima facie elements for its interference claim.  Finally, plaintiffs argue neither

26   the competition privilege nor the common interest privileges support dismissal.

27   ii.      Analysis

28           The statute of limitations for this claim is three years from the date injury.  N.Y. CPLR § 214.

1   The injury did not occur until "Aisling succumbed to [defendants] threats and agreed to reduce

2   [plaintiff's] $15 million investment in the Aisling Fund to $5 million." (FAC, ¶ 57.) Plaintiffs assert

3   this occurred after November 26, 2005, less than three years before the filing of the FAC. Therefore,

4   the statute of limitations does not bar the claim.

5           Under New York law, a claim for tortious interference with prospective economic advantage

6   lies where "(1) the plaintiff had a business relationship with a third party; (2) defendant knew of such

7   relationship and intentionally interfered with it; (3) defendant acted solely out of malice, or used

8   dishonest, unfair, or improper means; and (4) defendant's actions injured the relationship between

9   plaintiff and third party." Henneberry, 415 F. Supp. 2d at 467. The complaint satisfies elements one,

10  two and four by adequately alleging plaintiffs had a relationship with Aisling, defendant knew of the

11  relationship, defendant intentionally interfered with the relationship, and defendant's actions injured

12  the relationship. Accordingly, the Court turns its analysis to the third element.

13          Plaintiffs must allege conduct that "amount[s] to a crime or an independent tort, or must be

14  engaged in 'for the sole purpose of inflicting intentional harm to the plaintiffs.'" Henneberry, 415 F.

15  Supp. 2d at 468 (quoting Caravel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004)). Plaintiffs

16  satisfy the third element because, as stated above, they adequately allege defendant's conduct

17  constituted an antitrust violation.

18          The competition privilege and the common interest privilege are affirmative defenses and, as

19  such, not grounds for dismissal. The "justification [for the competition privilege] is a question for the

20  jury" based on various factual elements. United Euram Corp. v. Occidental Petroleum Corp., 474

21  N.Y.S.2d 372, 375 (N.Y. Sup. Ct. 1984). Similarly, the common interest privilege "constitutes an

22  affirmative defense . . ., [therefore,] it does not lend itself to a pre-answer motion to dismiss." Demas

23  v. Levistsky, 738 N.Y.S.2d 402, 410 (NY. App. Div. 2002). Accordingly, the Court DENIES

24  defendant's motion to dismiss the interference claim.

25  **3.      Conversion**

26          Defendant allegedly converted "confidential documents (including the referenced e-mail)."

27  (FAC ¶ 76.) The "referenced e-mail" was an internal email defendant allegedly took from plaintiffs.

28  i.      Parties Argument

Defendant argues (1) an email cannot be converted, (2) plaintiffs have failed to allege defendant wrongfully obtained the email, (3) the possession of the email did not substantially interfere with plaintiffs' possession, and (4) plaintiffs have not identified any confidential documents converted.

Plaintiffs argue they have pled (1) ownership and right to possession of the confidential e-mail, (2) defendant's intentional interference with plaintiffs' right of possession, and (3) damages. Plaintiffs discuss at length whether email can be converted.

ii.    Analysis

The elements of conversion in New York are (1) the plaintiff's right to possession, (2) intent of the defendant, and (3) defendant's interference with plaintiff's property rights to the exclusion of plaintiff's rights.  Meese v. Miller, 436 N.Y.S.2d 496 (N.Y. App. Div., 1981)  Plaintiffs allege a right to possess the confidential documents (including the email), defendant intended to convert the documents, and defendant interfered with plaintiffs' property right by using the documents to the exclusion of plaintiffs' rights.  Further plaintiffs allege the conversion has caused damages in excess of $75,000.  This is sufficient to maintain a conversion action in New York.

The issue of whether an email can be converted is irrelevant because the complaint clearly alleges the conversion of "confidential documents (including the referenced e-mail)."  (FAC ¶ 77.)  A plain reading of this paragraph implies defendant also converted documents other than the referenced email. Even if the email cannot be converted, plaintiffs have sufficiently alleged defendant converted other confidential documents.  Therefore, the Court need not reach the question at this juncture and DENIES defendant's motion to dismiss the conversion claim.

**D. Motion to Strike Pursuant to Rule 12(f)**

i.    Parties' Argument

Defendant urges the Court strike paragraphs 18-43 of plaintiffs' complaint because they purportedly violate California's litigation privilege and the Federal Noerr-Pennington doctrine. Defendant cites cases extending both doctrines to prelawsuit communications.  Sengchanthalangsy v. Accelerated Recovery Specialists, Inc., 473 F. Supp. 2d 1083, 1088 (S.D. Cal. 2007) (extending California litigation privilege to demand letters); Sosa v. DIRECTV, Inc., 437 F.3d 923, 933 (9th Cir. 2006) (extending Noerr-Pennington doctrine to demand letters).  Defendant argues the factual

1    allegations reference a draft complaint it sent to plaintiffs as a prelawsuit invitation to settle, therefore,

2    these allegations should be barred under both <u>Sengchanthalangsy</u> and <u>Sosa</u>.

3          Plaintiffs argue defendant's motion fails to identify the privileged communication and does

4    not explain how plaintiffs' use violated the privilege.  Plaintiffs also argue the reliance on the draft

5    complaint does not violate either privilege.

6    <u>ii.</u>      <u>Analysis</u>

7          As a preliminary matter, for the reasons discussed above, the Court applies New York

8    litigation privilege law.  In New York, "a statement made in the course of legal proceedings is

9    absolutely privileged if it is at all pertinent to the litigation." <u>Lacher v. Engel</u>, 817 N.Y.S.2d 37 (N.Y.

10   App. Div. 2006) (citing <u>Youmans v. Smith</u>, 47 N.E. 265 (N.Y. 1897)).  The privilege extends to

11   "preliminary stages or investigative stages of the process." <u>Rosenberg v. MetLife, Inc.</u>, 866 N.E.2d

12   439, 443 (N.Y. 2007).  The privilege is intended to prevent parties from being held liable for

13   exercising their right to access the courts.  <u>Id.</u>  The usual context in which this arises is suits for

14   defamation based upon the filing of a complaint.  <u>See, e.g., Toker v. Pollak</u>, 376 N.E.2d 163 (N.Y.

15   1978).

16         The <u>Noerr-Pennington</u> doctrine "ensures that those who petition the government for redress

17   of grievances remain immune from liability for statutory violations, notwithstanding the fact that their

18   activity might otherwise be proscribed by the statute involved ." <u>White v. Lee</u>, 227 F.3d 1214, 1231

19   (9th Cir. 2000).  The purpose of the doctrine is to protect the right to petition the government.  <u>Id.</u>

20         Both the litigation privilege and the <u>Noerr-Pennington</u> doctrine seek to prohibit suits aimed

21   to punish parties for seeking access to the courts.  In the instant case, plaintiffs do not bring any cause

22   of action to punish defendant for its  prelawsuit communications.  This is not an action for defamation

23   and plaintiffs do not rely on the act of sending the complaint as a basis for a cause of action.  The draft

24   complaint may have been a catalyst for the instant litigation, but these doctrines do not bar access to

25   the courts in this situation.  Accordingly, the Court DENIES defendant's motion to strike.

26   **E.  Motion to Dismiss or Stay the Declaratory Relief Claim**

27         Plaintiffs request the Court declare the rights of the parties concerning the alleged conduct of

28   Macquarie's former employee Peter Martenson.  Martenson allegedly sent emails to defendant's

1  employees and the press pretending to be an executive working for defendant.  These actions allegedly

2  caused $25,000,000 in damages to defendant.  On May 23, 2008, defendant filed a complaint in

3  California state court based on these facts.

4  i.        Parties' Arguments

5          Defendant moves the Court to dismiss or stay plaintiffs' declaratory judgement action in favor

6  of defendant's California state lawsuit.  Defendant notes the Court has broad discretion to exercise its

7  jurisdiction under the Declaratory Judgment act.  Assessing factors set forth in Brillhart v. Excess Ins.

8  Co. of America, 316 U.S. 491 (1942), defendant argues dismissal would avoid needless determination

9  of state laws issues, discourage forum shopping, and avoid duplicative litigation.  Further, defendant

10  argues the declaratory judgment action serves no useful purpose, would not finalize the controversy,

11  is merely "procedural fencing,"and raises unnecessary federalism issues.[4]  Government Employees

12  Ins. Co. v. Dizol, 133 F.3d 1220, 1225 (9th Cir. 1998).

13          Plaintiffs argue the presence of their other substantive claims weighs in favor of the Court

14  retaining jurisdiction, citing Dizol, 133 F.3d at 1225-26.  Plaintiffs assert adjudication of the

15  declaratory judgment action would not be duplicative because the state court has stayed the action and

16  the parties are substantially similar.  Further, plaintiffs argue adjudication of the declaratory judgment

17  action would not lead to needless determination of state law.  Plaintiffs aver they have not engaged

18  in forum shopping and the action serves the useful purpose of clarifying liabilities.

19  ii.       Analysis

20          "The Declaratory Judgment Act embraces both constitutional and prudential concerns." Dizol,

21  133 F.3d at 1222.  A plaintiff seeking federal declaratory relief must have Article III standing, satisfy

22  the case and controversy requirement, and fulfill all statutory prerequisites.  Id. at 1222-23.  The

23  parties do not dispute plaintiff has fulfilled these requirements and the Court, upon its own review,

24  finds plaintiff satisfies these prerequisites.  "If the suit passes constitutional and statutory muster, the

25  district court must also be satisfied that entertaining the action is appropriate.  This determination is

26  discretionary . . .." Id.

27  _____

28          [4] "Procedural fencing" means that the action is merely the product of forum shopping.
Sherwin-Williams Co. v. Holmes County, 343 F.3d 383, 390 n. 2 (5th Cir. 2003).

A federal district court's broad discretion to abstain in declaratory relief actions empowers it to stay or dismiss such actions in favor of pending state court proceedings involving the same issue and parties. <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 287-89 (1995). The Court is guided by the factors first articulated in <u>Brillhart</u> – avoidance of needless determination of state law issues, discouragement of forum shopping, and avoidance of duplicative litigation. <u>Brillhart</u>, 316 U.S. 491, 495 (1942). Additionally, courts may inquire: (1) whether the declaratory action will settle all aspects of the controversy; (2) whether the declaratory action will serve a useful purpose; (3) whether the action is brought merely for "procedural fencing"; and (4) whether the declaratory action will unnecessarily entangle the state and federal courts. <u>Dizol</u>, 133 F.3d at 1225 n.5 (citations omitted).

Turning first to the <u>Brillhart</u> factors, entertaining the declaratory judgment claim would result in needless determination of state law issues. When the sole basis of jurisdiction is diversity of citizenship, the federal interest is at its nadir and the policy of avoiding unnecessary determination of state law is especially strong. <u>Allstate Life Ins. Co. v. Sundboll</u>, 1995 WL 566040 at *3 (N.D. Cal. 1995). According to plaintiffs, defendant does not allege plaintiffs violated any federal laws (see defendant's draft complaint (FAC, Ex. A)); therefore, diversity would be the sole basis of jurisdiction. Further, the declaratory judgment claim arises from a different case and controversy than plaintiffs' other claims. The declaratory judgment claim concerns Peter Martenson, who allegedly sent false materials to defendant's employees and the press, pretending to be an executive working for defendant. Plaintiffs' other claims involve defendant's interference with its investment opportunities, a factually and temporally distinct controversy. Therefore, the Court need not determine the state law issues underlying the declaratory judgment claim. Further, entertaining the declaratory judgment claim would encourage forum shopping. "A party should not be allowed to choose a less appropriate federal forum by hasty initiation of a federal proceeding which is parallel to a state proceeding." <u>Allstate</u>, 1995 WL 566060 at *3. Here, the federal forum is inappropriate because the federal proceeding involves only state claims and is parallel to a state proceeding; therefore plaintiffs should not be allowed to force defendant, who is the natural plaintiff, into the federal forum. Finally, duplicative litigation would result if both this Court and the state court allow the claims to proceed. All of these factors weigh against entertaining the declaratory judgment claim.

1   Similarly, the other Ninth Circuit factors also weigh against hearing the declaratory judgment

2   claim. The declaratory judgment claim would not completely resolve the controversy because plaintiff

3   omitted key parties in interest – most notably Peter Martenson. Further, the action serves no useful

4   purpose. "The 'useful purpose' served by the declaratory judgment action is the clarification of legal

5   duties for the future, rather than the past harm a coercive tort action is aimed at redressing." Amsouth

6   Bank v. Dale, 386 F.3d 763, 786 (6th Cir. 2004). Plaintiffs merely seek to have the court conduct a

7   tort-style inquiry into the past conduct of Peter Martenson and determine liability – this is not the

8   useful purpose described in Amsouth. See also, 10B C. Wright, A. Miller & M. Kane, Federal

9   Practice & Procedure §2758 (3d ed 1998) ("[I]t is not the function of the federal declaratory action

10  merely to anticipate a defense that otherwise could be presented in a state action."). Additionally, the

11  declaratory judgment claim appears to be procedural fencing, an attempt to place the action in a

12  federal forum rather than the appropriate state forum. Finally, the claim would unnecessarily cause

13  friction between the state and federal courts because both courts would be adjudicating the same issue

14  simultaneously. These factors weigh against entertaining the declaratory judgment claim in this Court.

15  The next issue is whether the Court should dismiss the claim or stay the action. In Exxon

16  Shipping Co. v. Airport Depot Diner, Inc., 120 F.3d 166 (9th Cir. 1997), the Ninth Circuit remanded

17  a declaratory judgment action with directions to dismiss when the court determined the declaratory

18  judgment served the improper purpose of attempting to displace a state court ruling. Similarly, in the

19  instant case, plaintiffs are trying to bring this state action into a federal court by bringing a declaratory

20  judgment claim. This Court GRANTS defendant's motion to dismiss the declaratory judgment claim.

21                                              **CONCLUSION**

22  For the foregoing reasons, the Court DENIES defendant's motion to dismiss the antitrust

23  claim, the New York Business Law Claim, the conversion claim, and the tortious interference with

24  prospective economic advantage claim. The Court DISMISSES WITH PREJUDICE plaintiff's

25  declaratory judgment claim because any amendment to that claim would be futile.

26  **IT IS SO ORDERED.**

27  **DATED: March 2, 2009**

28                                              **IRMA E. GONZALEZ, Chief Judge**
                                                **United States District Court**